TRINETTE G. KENT (State Bar No. 025180)
3219 E Camelback Rd #588
Phoenix, AZ 85018
Telephone: (480) 247-9644
Facsimile: (480) 717-4781
E-mail: tkent@lemberglaw.com

Anthony Paronich
Email: anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: (508) 221-1510
*Pro Hac Vice*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Sidney Naiman, individually and on behalf of a class of all persons and entities similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>Hard Tack, Inc.; and Nation Motor Club, LLC<br><br>Defendants. | Case No. 2:19-cv-01738-JJT<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

**Preliminary Statement**

1. "Month after month, unwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by" the Federal Communications Commission ("FCC").[1]

2. Plaintiff Sidney Naiman brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

3. In violation of the TCPA, Nation Motor Club, LLC ("Nation Motor") hired the co-defendant, Hard Tack, Inc. ("Hard Tack"), who made telemarketing calls to a cellular telephone number of Mr. Naiman for the purposes of advertising Nation Motor goods and services using an automated dialing system and a pre-recorded message, which is prohibited by the TCPA.

4. Hard Tack made these calls because of an agreement with Nation Motor, who hired Hard Tack to generate business through telemarketing, and maintained interim control over their actions.

5. The Plaintiff never consented to receive the calls, which were placed to him for telemarketing purposes. Because telemarketing campaigns generally place calls to thousands or even millions of potential customers *en masse*, the Plaintiff brings this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of the Defendants.

---

[1] *Omnibus TCPA Order*, GC Docket 02-278, FCC 15-72, 2015 WL 4387780, ¶1 (July 10, 2015).

6. A class action is the best means of obtaining redress for the Defendants' wide scale illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

**Parties**

7. Plaintiff Naiman is a resident of Arizona in this District.

8. Defendant Nation Motor Club, LLC is a corporate entity formed under the laws of the Delaware, yet maintains its principal place of business at 800 W. Yamato Rd., Suite 100 in Boca Raton, FL 33431 with a registered agent of NRAI Services, Inc. at 1200 South Pine Island Rd., Plantation, FL 33324. It regularly conducts business in this District, as it attempted to do with the Plaintiff.

9. Defendant Hard Tack, Inc. is a corporate entity registered in Delaware and maintains its principal place of business at 3300 South Dixie Highway, Suite 1-267 in West Palm Beach, FL 33406. Hard Tack regularly conducts business in this District, including through the making of telemarketing calls, as it did with the Plaintiff.

**Jurisdiction & Venue**

10. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiff's claims arise under federal law.

11. Venue is proper under 28 U.S.C. § 1391(b)(2) because the calls that were initiated to the Plaintiff that are the subject of the litigation were made to a cellular

telephone number in this District. As such, a substantial part of the events giving rise to the claims occurred in this District.

**TCPA Background**

12. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

13. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." *See* 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

14. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

15. The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules*

*and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

16. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted).

17. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman).

18. "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016), https://www.ftc.gov/system/files/documents/advocacy_documents/commentstaff-

ftc-bureau-consumer-protection-federal-communications-commission-rulesregulations/160616robocallscomment.pdf.

19. In fiscal year 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-nationaldo-not-call-registry-data-book-dnc.

20. *The New York Times* recently reported on the skyrocketing number of robocall complaints and widespread outrage about illegal telemarketing. Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-riseillegal.html; *see also* Katherine Bindley, *Why Are There So Many Robocalls? Here's What You Can Do About Them*, Wall St. J. (July 4, 2018), https://www.wsj.com/articles/why-there-are-so-manyrobocalls-heres-what-you-can-do-about-them-1530610203.

21. Even more recently, a technology provider combating robocalls warned that nearly half of all calls to cell phones next year will be fraudulent. Press Release, First Orion, Nearly 50% of U.S. Mobile Traffic Will Be Scam Calls by 2019 (Sept. 12, 2018), https://www.prnewswire.com/news-releases/nearly-50-of-us-mobile-traffic-will-be-scam-calls-by-2019-300711028.html

**Factual Allegations**

22. Nation Motor provides extended warranty services to consumers.

23. To generate business through sales, Nation Motor relies on telemarketing.

24. However, Nation Motor's contact with the potential new customers is limited, and the telemarketing is conducted by third parties.

25. One of Nation Motor's strategies for telemarketing involves the use of an automatic telephone dialing system ("ATDS") to solicit business by third parties.

26. Nation Motor's strategies for telemarketing also involve the use of pre-recorded messages to solicit business by third parties.

27. Nation Motor engages this use of this equipment and the technology of recorded messages because it allows for thousands of automated calls to be placed at one time, but its telemarketing representatives, who are paid by the hour, only talk to individuals who pick up the telephone.

28. Through this method, Nation Motor shifts the burden of wasted time to the consumers it calls with unsolicited messages.

29. On December 11, 2018, Mr. Naiman received a call with a pre-recorded message from Hard Tack on his cellular telephone line, (925) 735-XXXX.

30. The call was made with an ATDS because there was a distinct "click and pause" at the outset of the call. Furthermore, a pre-recorded message was played. It would be illogical to hand-dial a telephone number only to play a pre-recorded message.

31. Furthermore, the call was sent from an area code local to the Plaintiff, 925-298-0729.

32. Hard Tack is in Florida, and the fact that the telemarketing call came from a local area code is indicative of the fact that it was made by an ATDS, as an ATDS allows a caller to manipulate the Caller ID.

33. Shortly after the call was connected to a live individual, and was able to identify that Nation Motor Club's services were being offered.

34. On December 20, 2018, Mr. Naiman received a call with a pre-recorded message from Hard Tack on his cellular telephone line, (925) 735-XXXX.

35. The call was made with an ATDS because there was a distinct "click and pause" at the outset of the call. Furthermore, a pre-recorded message was played. It would be illogical to hand-dial a telephone number only to play a pre-recorded message.

36. Furthermore, the call was sent from an area code local to the Plaintiff, 925-298-0729.

37. Hard Tack is in Florida, and the fact that the telemarketing call came from a local area code is indicative of the fact that it was made by an ATDS, as an ATDS allows a caller to manipulate the Caller ID.

38. Shortly after the call was connected to a live individual, the connection was terminated.

39. On December 26, 2018, Mr. Naiman received a call with a pre-recorded message from Hard Tack on his cellular telephone line, (925) 735-XXXX.

40. The call was made with an ATDS because there was a distinct "click and pause" at the outset of the call. Furthermore, a pre-recorded message was played. It would be illogical to hand-dial a telephone number only to play a pre-recorded message.

41. Furthermore, the call was sent from an area code local to the Plaintiff, 925-298-0729.

42. Hard Tack is in Florida, and the fact that the telemarketing call came from a local area code is indicative of the fact that it was made by an ATDS, as an ATDS allows a caller to manipulate the Caller ID.

43. Shortly after the call was connected to a live individual, the connection was terminated.

44. The calls were not necessitated by an emergency.

45. All parties were in the United States during the calls.

46. Plaintiff's privacy has been violated by the above-described telemarketing robocalls from, or on behalf of, Defendants. The calls were an annoying, harassing nuisance.

47. Plaintiff and all members of the Class, defined below, have been harmed by the acts of Defendants because their privacy has been violated, they were annoyed and harassed, and, in some instances, they were charged for incoming calls. The calls occupied his cellular telephone lines, rendering them unavailable for legitimate communication.

**Nation Motor's Liability and its Arrangement with Hard Tack**

48. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

49. On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers."[2]

50. In that ruling, the FCC instructed that sellers such as Nation Motor may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

51. The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

52. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

---

2 *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling").

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

FCC Rcd at 6592 (¶ 46).

53. By engaging Hard Tack to make calls on behalf of its agents to generate new business, Nation Motor "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency.

54. Moreover, Nation Motor maintained interim control over Hard Tack's actions.

55. For example, Nation Motor had absolute control over whether, and under what circumstances, it would accept a customer.

56. Furthermore, Nation Motor had day-to-day control over Hard Tack's actions, including the ability to prohibit it from using an ATDS to contact potential customers of Nation Motor. Nation Motor failed to make such an instruction to Hard Tack, and as a result, is liable for Hard Tack's conduct.

57. Additionally, Nation Motor restricted the geographic location and customer qualifications that Hard Tack could promote for Nation Motor.

58. Nation Motor also gave interim instructions to Hard Tack by providing the volume of calling and leads it would purchase.

59. Hard Tack transferred customer information directly to Nation Motor. Thus, the company that Nation Motor hired has the "ability . . . to enter consumer information into the seller's sales or customer systems," as discussed in the May 2013 FCC Ruling. As such, the company that Nation Motor hired is an apparent agent of Nation Motor.

60. Nation Motor had also previously been sued for the actions of third party telemarketers it hired, and as such was on notice that third parties, such as Hard Tack, were violating the TCPA on Nation Motor's behalf.

61. Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46). Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

**Class Action Allegations**

62. As authorized by Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

63. The class of persons Plaintiff proposes to represent are tentatively defined as:

> All persons within the United States to whom: (a) Hard Tack and/or a third party acting on their behalf, made one or more non-emergency telephone calls; (b) promoting Nation Motor and/or Hard Tack products or services; (c) to their cellular telephone number; (d) using an automatic telephone dialing system or an artificial or prerecorded voice; and (e) at any time in the period that begins four years before the date of the filing of this Complaint to trial.

Excluded from the class are the Defendants, and any entities in which the Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned and any member of such judge's staff and immediate family.

64. The class as defined above is identifiable through phone records and phone number databases.

65. The potential class members number at least in the thousands, since automated telemarketing campaigns make calls to hundreds or thousands of individuals a day. Individual joinder of these persons is impracticable.

66. Plaintiff is a member of the proposed class.

67. There are questions of law and fact common to Plaintiff and to the proposed class, including but not limited to the following:

a. Whether Defendants violated the TCPA by using automated telemarketing to call cellular telephones;

b. Whether Defendants placed calls using an automatic telephone dialing system;

c. Whether Nation Motor is vicariously liable for the conduct of Hard Tack;

d. Whether Defendants placed calls without obtaining the recipients' prior consent for the call;

e. Whether the Plaintiff and the class members are entitled to statutory damages because of Defendants' actions.

68. Plaintiff's claims are typical of the claims of class members. Plaintiff's claims, like the claims of the Class arise out of the same common course of conduct by the defendants and are based on the same legal and remedial theories.

69. Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the class, he will fairly and adequately protect the interests of the class, and he is represented by counsel skilled and experienced in class actions, including TCPA class actions.

70. Common questions of law and fact predominate over questions affecting only individual class members. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendants and/or their agents.

71. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action.

72. The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

**First Cause of Action**

**Violation of the TCPA, 47 U.S.C. § 227(b) and 47 C.F.R. § 64.1200(a)**

73. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

74. The Defendants violated the TCPA by (a) initiating a telephone call using an automated dialing system or prerecorded voice to Plaintiff's telephone numbers assigned to a cellular telephone service, or (b) by the fact that others caused the initiation of those calls on its behalf. *See* 47 C.F.R. 64.1200(a)(1)(iii); 47 U.S.C. § 227(b)(1).

75. The Defendants' violations were negligent, willful, or knowing.

**Prayer for Relief**

For himself and all class members, Plaintiff requests the following relief:

1. That Defendants be restrained from engaging in future telemarketing in violation of the TCPA.

2. That Defendants, their agents, and anyone acting on their behalf, be immediately restrained from altering, deleting, or destroying any documents or records that could be used to identify class members.

3. That the Court certify the proposed class under Rule 23 of the Federal Rules of Civil Procedure.

4. That the Plaintiff and all class members be awarded statutory damages of $500 for each negligent violation of the TCPA, and $1,500 for each knowing violation, and all other relief that is joint and equitable.

5. The TCPA authorizes injunctive relief to prevent the Defendants from using automatic telephone dialing equipment.

6. The Plaintiff respectfully petitions this Court to order the Defendants, and their employees, agents and independent contractors, to immediately cease engaging in unsolicited telemarketing in violation of the TCPA.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

Dated: April 17, 2019

Respectfully Submitted,

*/s/ Anthony Paronich*
Anthony Paronich